

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00280-CV

IN THE INTEREST OF S.D. AND
G.D., MINOR CHILDREN

----------

FROM THE 442ND DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 2010-61222-393

----------

## MEMORANDUM OPINION[1]

----------

In this private termination suit, Appellant N.D. (Mother) appeals from the

trial court's judgment terminating the parent-child relationship between her and

the children who are the subject of this suit, S.D. and G.D.[2]  Because we sustain

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

a portion of both Mother's sixth and seventh issues, we modify the trial court's judgment and affirm the judgment as modified.

## I. BACKGROUND

C.D. (Father) and Mother married in 2003.  While married, they had two children, S.D. and G.D.  In July 2010, Father filed for divorce, and shortly after he did so, Mother alleged that Father had physically and sexually abused S.D. and had physically abused G.D.  Indeed, throughout the course of the divorce proceedings, Mother made multiple abuse allegations that resulted in multiple investigations of Father by Child Protective Services (CPS).  Each CPS investigation of Father yielded the conclusion that Father had not abused the children.  However, Mother's numerous unfounded allegations of abuse against Father ultimately led CPS to investigate her for emotional abuse of S.D. CPS concluded that Mother had been coaching S.D. to make allegations of abuse against Father, and it made multiple findings of reason to believe that Mother had been emotionally abusive to S.D.

On April 30, 2012, the trial court granted the divorce.  The final divorce decree appointed Father and Mother as joint managing conservators of the children.  It included a finding that there was credible evidence that Mother had a history or pattern of emotional abuse against S.D., as well as a modified possession order that provided, in pertinent part, the following:  until Mother began seeing a therapist specializing in treating false memory syndrome and anger management and provided Father with written verification that she was

2

seeing such a therapist, she was entitled to (1) unsupervised possession of the children every Thursday evening through Friday morning, and (2) supervised possession of the children during the afternoons of the first, third, and fifth Sundays of every month. The modified possession order further provided that as Mother completed more sessions of therapy, she would gain more unsupervised possession of the children.[3] The decree also ordered Mother to pay $997.08 in monthly child support beginning May 1, 2013. The one-year delay of the child-support payments was purposeful: it was done so that Mother could and would attend and complete the court-ordered therapy.[4]

Mother's first unsupervised overnight visitation occurred from Thursday, May 3 through Friday, May 4, 2012. To facilitate Mother's unsupervised overnight visitations, Father and Mother established a routine whereby Father and the children would meet Mother in a McDonald's parking lot on Thursday evenings and Father would transfer the children to Mother. The next morning, Mother and the children would meet Father in the same parking lot so that Mother could deliver the children back to Father. Father and Mother kept this routine nine consecutive times without incident. That changed on the tenth

---

[3]The threshold requirement for additional unsupervised visitation with the children was that Mother attend five therapy sessions. Thereafter, as her therapy visits increased, so would the unsupervised visitations.

[4]Mother began counseling on May 15, 2012 and attended five counseling sessions through July 2012. She briefly resumed those sessions from September to November 2015. She resumed them again in May 2016.

3

exchange: on Thursday evening, July 12, 2012, Father met Mother in the McDonald's parking lot as usual and transferred the children to her for her overnight visitation period, but Mother did not return the children to Father the next morning as required. After Father waited in the parking lot for approximately two-and-a-half hours and Mother did not show, he drove to the police station and reported the children's absence. Fifteen days later, on July 28, 2012, authorities discovered Mother and the children in a hotel room in Las Vegas, Nevada. The authorities had to negotiate with Mother through the hotel room door for her to return the children. When Father arrived to pick them up, the children were frantic and in shock. After the children returned home with Father, they began experiencing nightmares and were afraid of being kidnapped again.

On August 10, 2012, Father filed a petition seeking to modify the terms of the divorce decree relating to Mother's access to the children, and on August 22, 2012, the trial court entered an agreed temporary injunction, which (1) prohibited Mother from having unsupervised possession of or access to the children, (2) provided that Mother could have supervised visitations with the children on the first, third, and fifth Saturdays of every month, and (3) named Forensic Counseling Services to perform the supervision. However, except for exchanging a few text messages with Father in December 2012 asking to speak with the children, Mother made no effort to talk to the children or arrange to see them until December 2013—more than sixteen months after the trial court's August 22, 2012 agreed order. Further, although she was ordered to begin

4

paying child support on May 1, 2013, Mother did not make any child support payments through December 2013.

Meanwhile, Mother had been charged with two counts of interference with child custody, and her trial on those charges was initially scheduled to begin in April 2014. *See* Tex. Penal Code Ann. § 25.03(a)(1) (West Supp. 2016). In December 2013, Mother contacted Forensic Counseling Services to arrange supervised visitation with the children. The parties arranged for Mother to begin the supervised visitations, with the first visitation scheduled for March 15, 2014. Mother's criminal trial was ultimately reset to the end of September 2014. In all, she attended sixteen two-hour supervised visits with the children, with the last one occurring on September 20, 2014, just prior to the date her criminal trial commenced. As of the end of September 2014, Mother still had not made a single child-support payment.

Mother's criminal trial on the child custody interference charges began on September 29, 2014. Mother relied on the affirmative defense of necessity and continued to assert that Father had physically and sexually abused S.D. and that she absconded with the children out of state in violation of the divorce decree because she feared for the children's safety. The evidence at trial, however, confirmed that CPS had made multiple findings that Father had not abused the children; that Mother had been repeatedly informed that there was no reason to believe that Father had abused the children—a fact that Mother admitted to in her testimony; and that CPS had made multiple findings of reason to believe that

5

Mother had emotionally abused S.D. The evidence further revealed that as a result of Mother's multiple unsubstantiated abuse allegations against Father, S.D. had been subjected to at least twenty-five pelvic examinations from the time Father filed for divorce through the time authorities discovered Mother and the children in Las Vegas. The evidence also revealed that the children feared Mother.[5] A jury found Mother guilty in both causes, she was sentenced to fifteen months' confinement for each offense, and she was immediately imprisoned. *See* Tex. Penal Code Ann. § 25.03(a)(1).

Mother appealed her convictions to this court. In December 2014, she posted a $10,000 bond and was released from jail pending the result of her appeal. On January 28, 2015, Father amended his modification petition seeking to terminate Mother's parental rights, and when Mother attempted to resume supervised visitations with the children while she was out on bond, the trial court entered a temporary injunction on February 11, 2015 that (1) prohibited Mother from approaching the children at any time or location, (2) prohibited Mother from removing the children from any location at any time, and (3) prohibited Mother from making any contact with the children, including by phone, email, or text

---

[5]For instance, one CPS investigator testified that after interviewing S.D. several times in separate abuse referrals initiated by Mother, she concluded that Mother was coaching S.D. to make abuse allegations against Father. The investigator testified that during one of those interviews, S.D. indicated that "her brain was hurting because she could not remember what she needed to say" and that if she did not say the right things, Mother would be mad at her and "she wouldn't get angel wings and she could burn in hell."

6

message.  The trial court further ordered Mother to complete seven counseling sessions with Dr. Miles Morrison, who was to provide a report regarding whether Mother should be allowed any contact with the children, and if so, the type of contact she should be allowed and under what circumstances.

Dr. Morrision's counseling sessions included two visits with the children and seven visits with Mother.  When visiting with Dr. Morrison, the children indicated that they felt unsafe with her and were fearful that she would take them again.  S.D. told Dr. Morrison that Mother had locked G.D. in a closet and fed him dog food.  She stated that if she did not do what Mother wanted her to do, then Mother would not love her anymore.  S.D. further stated that whenever Mother had possession of them, she would leave them at their grandmother's house because Mother's house "was full of dog poop and barf."  S.D. also said that Mother left them with their grandmother, who did not speak English, and Mother went to stay with someone else.  Finally, S.D. told Dr. Morrison that Mother tried to get her to lie about Father, and if she did not do it, Mother would take things away from her or not let her have any food.  Dr. Morrison did not observe any bond between the children and Mother, nor did he perceive any desire in the children to re-establish a relationship with Mother.

When Mother met with Dr. Morrison, she said things that caused him to believe that she might leave with the children again if given the opportunity.  She told him that when she left with the children, she drove them to Oklahoma, back to Texas, then to Arizona, until finally reaching Nevada.  And she told him that

there were times "when the law is second." She did not demonstrate any remorse for her conduct. Dr. Morrison completed a report on April 20, 2015, and concluded that reunification would be inappropriate, at least until such time as Mother's criminal appeal was final, and if ultimately affirmed, she served out the entirety of her jail sentence.

The trial court's February 11, 2015 no-contact order remained in place. Notwithstanding that order, in early July 2015, Mother mailed some birthday gifts for S.D., as well as Christmas gifts for both children. On July 26, 2015, Mother sent one text message to Father stating that she wanted to speak with the children. Additionally, she sent one card dated July 10, 2015 to the children, as well as one letter dated September 23, 2015. Other than these items, Mother did not send the children any cards, letters, or Christmas presents from the time of the divorce through at least September 23, 2015.

As of October 2015, thirty months after child support was to begin under the divorce decree, Mother had not made a single child-support payment. On October 13, 2015, Mother for the first time filed an answer to Father's amended modification petition, and three days later, she filed a counterpetition seeking to be named as the children's sole managing conservator, as well as a progressive reunification of possession of and access to the children. The termination proceeding was initially scheduled for October 2015, but it was continued because Mother was not prepared. In mid-November 2015, Mother finally made her first child-support payment; however, although her monthly support obligation

8

totaled $997.08, she made a payment of only $197.00. From that time through June 2016, she made a few additional small child-support payments.[6]

On June 13, 2016, the trial court held a bench trial on the merits of Father's amended modification and termination petition. All of the above evidence was presented to the trial court, and following the hearing, the trial court terminated Mother's parental rights. In eight issues, Mother appeals.

## II. LEGAL AND FACTUAL SUFFICIENCY

Mother's parental rights were terminated pursuant to section 161.001 of the Texas Family Code, which provides that a court may order the termination of the parent-child relationship if it finds by clear and convincing evidence that (1) the parent has committed at least one of several statutorily-defined acts or omissions, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1)–(2) (West Supp. 2016). Here, the trial court found by clear and convincing evidence that Mother committed four of the statutorily-defined acts or omissions:

> (C) voluntarily [leaving] the [children] alone or in the possession of another without providing adequate support of the [children] and [remaining] away for a period of at least six months;

> (D) knowingly [placing] or knowingly [allowing] the [children] to remain in conditions or surroundings which [endangered] the physical or emotional well-being of the [children];

---

[6]By the time of trial, Mother's total child-support obligation totaled $37,889.04, and she had only paid $1,347.35, leaving an arrearage of $36,541.69.

9

(E) [engaging] in conduct or knowingly [placing] the [children] with persons who engaged in conduct which [endangered] the physical or emotional well-being of the [children]; [and]

(F) [failing] to support the [children] in accordance with [her] ability during a period of one year ending within six months of the date of the filing of the [termination] petition[.]

*See id.* § 161.001(b)(1)(C)–(F). And it found by clear and convincing evidence that termination of the parent-child relationship was in the best interest of the children. *See id.* § 161.001(b)(2). In her first five issues, Mother contends that none of these findings is supported by legally and factually sufficient evidence.

## A. STANDARD OF REVIEW

### 1. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged finding was true*. In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### 2. Factual Sufficiency

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.,* 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that (1) Mother violated the asserted section 161.001 grounds and (2) termination of the parent-child relationship would be in the best interest of the children. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.,* 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.,* 209 S.W.3d at 108.

## B. TRIAL COURT'S TERMINATION-GROUNDS FINDINGS

In her third issue, Mother challenges the legal and factual sufficiency of the trial court's finding pursuant to subsection 161.001(b)(1)(E) that she "engaged in conduct or knowingly placed the children with persons who engaged in conduct that endanger[ed] the physical or emotional well-being of the children[.]" *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). She contends that the only evidence in the record that could support termination under subsection (E) is her single act of taking the children to Las Vegas. Because termination under subsection (E) must be based upon more than one act or omission, Mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights under that provision.

Subsection (E) permits termination of a parent's parental rights if there is clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). The term "endanger" under this provision means "to expose to loss or injury, to jeopardize." *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.— Fort Worth 2004, pet. denied); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Termination under subsection (E) requires that the endangerment to the child's physical or emotional well-being be a direct result of the parent's conduct, and thus we consider only the parent's conduct when reviewing a termination under that provision. *See R.W.*, 129 S.W.3d at 738

12

(stating that in analyzing subsection (E) termination, we "must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct"); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.) (stating that subsection (E) "requires us to look at the parent's conduct alone"). The conduct we consider includes the parent's actions, omissions, and failure to act. *R.W.*, 129 S.W.3d at 738; *D.M.*, 58 S.W.3d at 811.

Further, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re S.A.P.*, 459 S.W.3d 134, 145 (Tex. App.—El Paso 2015, no pet.); *D.M.*, 58 S.W.3d at 812. However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *R.W.*, 129 S.W.3d at 738. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *R.W.*, 129 S.W.3d at 738.

We turn now to Mother's contention that her act of absconding with the children out of state is the only evidence pertinent to the trial court's subsection (E) finding. This argument is not persuasive.[7] The record contains evidence that

---

[7]As we noted above, in our sufficiency review we consider the entire record. *See J.P.B.*, 180 S.W.3d at 572–73 (noting that in a legal sufficiency review in a parental termination case, a court should consider all the evidence); *A.B.*, 437 S.W.3d at 500 (noting same for factual sufficiency review). The relevant record evidence in this case does not begin with Mother's taking of the

13

from the time Father filed for divorce in July 2010 until the time the divorce was granted in April 2012, Mother made repeated unfounded allegations that Father was abusing the children; that CPS repeatedly told her that Father had not abused the children; that Mother admitted she was told this multiple times; that Mother kept making the allegations even though CPS investigators told her that such allegations were not helpful to S.D.; that Mother repeatedly coached S.D. to lie about Father abusing her; that S.D. was fearful that if she did not tell the CPS investigators what Mother told her to, then Mother would be mad at her and "she wouldn't get angel wings and could burn in hell"; and that eventually, CPS made multiple findings of reason to believe that Mother had emotionally abused S.D. Mother's actions resulted in S.D. undergoing at least twenty-five pelvic examinations. The record also contains evidence that despite being told multiple times by CPS that Father was not abusing the children, Mother absconded with them out of state in July 2012 because, according to her, she still believed Father was abusing them; that when authorities discovered the children in Las Vegas, she had the children with her in a hotel room, and the authorities had to negotiate with her through the hotel room door for the return of the children; and that upon being returned to Father, the children began to have nightmares about being taken from their home and being kidnapped.

---

children out of state in July 2012. Rather, it begins with Father's filing for divorce in July 2010.

14

In addition, the evidence included Dr. Morrison's April 20, 2015 report in which he stated that he had seen the children sometime after February 11, 2015; that when he saw them, they indicated that they felt unsafe with their Mother; that S.D. stated that if she did not do what Mother wanted her to do, then Mother would not love her anymore; and that S.D. also stated that Mother tried to get her to lie about Father, and if she did not do it, Mother would take things away from her or not let her have any food. Dr. Morrison also saw Mother during that period, and his report stated that Mother said things that caused him to believe that she might leave with the children again if given the opportunity; that Mother told him that there were times "when the law is second"; and that Mother did not demonstrate any remorse for her conduct. And when Dr. Morrison testified at the June 2016 termination hearing, he stated that Mother's continued insistence that she absconded with the children to protect them concerned him gravely.

We conclude that the above evidence is legally and factually sufficient for a factfinder to reasonably form a firm belief or conviction that Mother engaged not just in a single act or omission that endangered the children's physical or emotional well-being, but in a voluntary, deliberate, and conscious course of conduct that endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *D.M.*, 58 S.W.3d at 812. We therefore overrule Mother's third issue.

Because we need only conclude that one of the termination grounds listed in subsection 161.001(b)(1) was supported by sufficient evidence, we do not

consider Mother's first, second, and fourth issues. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## C. BEST INTEREST FINDING

In her fifth issue, Mother challenges the legal and factual sufficiency of the trial court's finding pursuant to subsection 161.001(b)(2) that termination of her parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *In re C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

    (F)    the plans for the child by these individuals or by the agency seeking custody;

    (G)    the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

As we recounted previously, the clear and convincing evidence showed that Mother engaged in a voluntary, deliberate, and conscious course of conduct that endangered the children's physical or emotional well-being, and we conclude all of the evidence supporting that finding is also relevant to the trial court's best-interest finding. *See E.C.R.*, 402 S.W.3d at 249 ("Many of the reasons supporting termination under [subsection 161.001(b)(1)] also support the trial court's best-interest finding."). In addition to that evidence, the court-appointed ad litem attorney testified that the children have no connection to Mother and do

not miss her; that the children remained fearful of Mother; and that termination of Mother's parental rights was in the children's best interest.

We conclude that the evidence is legally and factually sufficient for a factfinder to reasonably form a firm belief or conviction that termination of Mother's parental rights is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We therefore overrule Mother's fifth issue.

### III. TRIAL COURT'S AWARD OF CHILD SUPPORT[8]

In her sixth issue, Mother argues that the trial court erred in entering a $37,889.04 child-support arrearage judgment against Mother because Father's live pleading at the time of the termination hearing made no request for such relief, and that even if the trial court properly included such an award, it erred by awarding compound rather than simple postjudgment interest on the child-support judgment.

### A. CHILD-SUPPORT JUDGMENT

We first address whether mother preserved the first part of her sixth issue—her complaint that the trial court erred in entering a child-support arrearage judgment because Father did not plead for that relief. To preserve a complaint for appellate review, a party must have presented to the trial court a

---

[8]After Father filed his brief, Mother filed an untimely reply brief without an accompanying motion to extend time. *See* Tex. R. App. P. 10.5(b), 38.6(d). After we notified Mother of the need for a motion to extend time, Mother filed such a motion, which we granted. Accordingly, we considered Mother's reply brief in our disposition of this appeal.

timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). A complaint that the trial court's judgment fails to comport with the pleadings must be preserved in order to raise it on appeal. *See, e.g.*, *Siegler v. Williams*, 658 S.W.2d 236, 240–41 (Tex. App.—Houston [1st Dist.] 1983, no writ) (recognizing complaint that judgment does not conform to the pleadings is waived where the party fails to object); *see also Malekzadeh v. Malekzadeh*, Nos. 14-05-00113-CV, 14-06-00341-CV, 2007 WL 1892233, at *1–2 (Tex. App.—Houston [14th Dist.] July 3, 2007, no pet.) (mem. op.) (holding father failed to preserve complaint that trial court's permanent injunction was erroneous because mother did not plead for it).

The record reflects that the parties put on evidence related to the amount of Mother's child-support obligation, her failure to pay in accordance with her obligation, and her ability to pay. During the presentation of this evidence—some of which Mother's attorney elicited from her when she testified—Mother never objected on the ground that Father's pleadings did not request the trial court to enter a judgment for child-support arrearage. After the trial court orally pronounced that it was entering a $37,889.04 judgment for child support arrearage, Mother did not object, though the trial court gave her the opportunity to do so. And although Mother raised an objection related to the trial court's

19

child-support arrearage judgment in her postjudgment motions to set aside, modify, and correct or reform the judgment and for new trial, she objected only on the ground that the trial court had erroneously ordered compounding rather than simple postjudgment interest on that award. Thus, Mother never raised in the trial court her complaint that the judgment for child support arrearage was erroneous because Father's pleadings did not request that relief. We therefore conclude that Mother did not preserve that complaint for our review. *See, e.g.*, *In re A.E.R.*, No. 05-15-00019-CV, 2016 WL 4205683, at *1, *3–4 (Tex. App.— Dallas Aug. 9, 2016, pet. filed) (mem. op.) (holding father failed to preserve complaint that trial court erred in awarding retroactive child support in final divorce decree because mother's pleadings did not seek that relief); *In re J.S.P.*, 278 S.W.3d 414, 423–24 (Tex. App.—San Antonio 2008, no pet.) (holding that by failing to object, father waived complaint that trial court erred by ordering him to pay child support because grandmother's pleadings did not seek that relief); *see also* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712. Accordingly, we overrule the first part of Mother's sixth issue.

## B. COMPOUNDING POSTJUDGMENT INTEREST ON CHILD SUPPORT ORDER

We turn now to the second part of Mother's sixth issue—her complaint that the trial court erred by awarding compounding rather than simple postjudgment interest on the child support judgment. Although Father argues that Mother did not preserve this issue, we conclude otherwise because she raised it in her postjudgment motions to set aside, modify, and correct or reform the judgment

and for new trial, which the trial court overruled. *See* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712. In its judgment, the trial court awarded postjudgment interest on the child-support judgment at a rate of six percent, compounded annually. The Texas Family Code provides that postjudgment interest on a judgment for child-support arrearage accrues at a rate of six percent simple interest per year. Tex. Fam. Code Ann. § 157.265(b) (West 2014) ("Interest accrues on child support arrearages that have been confirmed and reduced to money judgment . . . at the rate of six percent simple interest per year . . . ."), (c) ("Interest accrues on a money judgment for retroactive or lump-sum child support at the annual rate of six percent simple interest . . . ."); *see In re W.R.B.*, No. 05-12-00776-CV, 2014 WL 1008222, at *1, *6 (Tex. App.—Dallas Feb. 20, 2014, pet. denied) (mem. op.) (holding trial court did not err by awarding simple rather than compounding postjudgment interest on child-support arrearage judgment). We therefore conclude that the trial court erred in awarding compounding rather than simple postjudgment interest on the child support arrearage judgment. Accordingly, we sustain the second part of Mother's sixth issue. We modify the trial court's termination order by deleting the words "compounded annually" from the language of the order providing postjudgment interest on the judgment for child support arrearages "at the rate of six percent (6%), compounded annually," and substituting in their place the words "simple interest annually." *See* Tex. R. App. P. 43.2(b).

21

## IV.  ATTORNEYS' FEES AS ADDITIONAL CHILD SUPPORT

In her seventh issue, Mother contends that the trial court erred by ordering her to pay attorneys' fees, and by making payment of that attorney-fee award collectible as child support.[9]  Similar to the first part of her sixth issue, Mother contends that the trial court erred in awarding attorneys' fees because Father did not plead for them, and pursuant to Rule 301 of the Texas Rules of Civil Procedure, the trial court's judgment must conform to the pleadings.  She also contends that the trial court's attorney fee award was erroneous because it lacks statutory authority.  However, the record reflects that Mother did not object to the trial court's award of attorneys' fees when it orally pronounced it was awarding those fees, although it gave her the opportunity to do so.  And although Mother raised an objection related to the trial court's attorneys' fees award in her postjudgment motions to set aside, modify, and correct or reform the judgment and for new trial, she objected only on the ground that the trial court had erroneously made those fees enforceable as child support.  Thus, to the extent that Mother's seventh issue argues that the trial court improperly awarded attorneys' fees to Father because his pleadings did not request that relief and because there was no statutory basis for the attorney-fee award, we conclude

_____

[9]The trial court ordered Mother to pay Father $28,000 in attorneys' fees, and it included a finding that that award was "reasonable and necessary for the benefit of the children and to collect previously ordered child support."  In addition, it ordered Mother to pay Father $10,000 in attorneys' fees in the event that she unsuccessfully appealed the trial court's termination order to this court, as well as $5,000 if Mother unsuccessfully appealed to the supreme court.

22

she did not preserve those arguments for our review. *See, e.g., Tex. Dep't Pub. Safety v. Burrows*, 976 S.W.2d 304, 307 (Tex. App.—Corpus Christi 1998, no pet.) (holding complaints that trial court's attorney-fee award was erroneous because it was unsupported by the pleadings and because it lacked statutory authority were not preserved); *see also* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712.

We turn now to Mother's complaint that the trial court erred by making the attorney-fee award enforceable as child support. Mother relies on the supreme court's recent decision in *Tucker v. Thomas*, 419 S.W.3d 292 (Tex. 2013), wherein the supreme court held that an award of attorneys' fees in a non-enforcement modification suit under Title 5 of the Texas Family Code may not be made enforceable as child support. 419 S.W.3d at 300–01. Mother contends that the trial court's attorney-fee award did not arise from any enforcement action Father filed but solely from Father's petition for modification and termination. Because attorney-fee awards cannot be made enforceable as child support in non-enforcement actions, Mother argues the trial court erred in making the attorney-fee award enforceable as child support. Thus, the question presented here is whether the trial court's attorney-fee award resulted from an enforcement action. We conclude it did not.

The record shows that on July 16, 2012, Father filed a motion for enforcement of possession pursuant to chapter 157 of the Texas Family Code. On August 20, 2012, he filed a petition for modification pursuant to chapter 156

23

of the Texas Family Code, which he ultimately amended to also seek termination. Looking to the language of the trial court's judgment, it is evident that the trial court did not award any attorneys' fees as the result of Father's motion for enforcement. The Texas Family Code provides that "[a]n enforcement order must include: (1) in ordinary and concise language the provisions of the order for which enforcement was requested; (2) the acts or omissions that are the subject of the order; (3) the manner of the respondent's noncompliance; and (4) the relief granted by the court." Tex. Fam. Code Ann. § 157.166(a) (West 2014).

The trial court's judgment does not contain any of the specific section-157.166 provisions required for an enforcement order. Thus, the trial court's attorney-fee award did not result from Father's enforcement motion but rather his modification and termination petition. Consequently, the trial court had no discretion to make the attorney-fee award enforceable as child support. *See Tucker*, 419 S.W.3d at 300–01 ("Because this case does not involve enforcement . . . the trial court lacked discretion to characterize [mother's] attorney's fees . . . as a part of [father's] child support obligation."). Accordingly, we sustain the part of Mother's seventh issue complaining of the trial court's ordering the attorney-fee award to be enforceable as child support. We modify the trial court's judgment to delete the following sentence: "This award for attorney's fees is collectable as child support." *See* Tex. R. App. P. 43.2(b).

24

In her eighth issue, Mother challenges the trial court's permanent injunction. First, as she did in her sixth and seventh issues, Mother contends that the permanent injunction the trial court granted does not comport with the pleadings—that is, she argues the trial court's injunction granted more relief than Father requested in his pleadings. However, Mother did not raise this complaint in the trial court, so she did not preserve it for our review. *See, e.g.*, *Malekzadeh*, 2007 WL 1892233, at *1–2 (holding father failed to preserve complaint that trial court's permanent injunction was erroneous because mother did not plead for it); *see also* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712.

Mother also argues that the trial court's order permanently enjoining her from "coming or remaining within 100 yards of any location where [Father or the children] are currently located" violates her state and federal constitutional rights. The extent of Mother's briefing on this argument is a one-sentence hypothetical and a one-sentence legal proposition citing, without analysis, three cases, none of which are termination cases. Specifically, Mother posits the hypothetical that, "[a]s [the injunction is] written, [she] could be at a restaurant, having just placed an order for dinner, and if [Father] or the children walk in to the restaurant, [she] would have to leave," and she states that "[a]n injunction, although it must be broad enough to cover the prohibited conduct, must not be drafted so broadly as to prohibit the enjoyment of lawful rights, or to operate perpetually against acts that in the future may become lawful." Mother does not identify any specific

25

constitutional provision that she contends the injunction violates. Nor does she provide any substantive argument regarding why, even assuming her hypothetical restaurant scenario is correct,[10] such a result would violate some state or federal constitutional right. Thus, we conclude Mother's complaint that the injunction is unconstitutional is inadequately briefed, and therefore waived. *See* Tex. R. App. P. 38.1(i); *In re J.H.*, No. 02-16-00009-CV, 2016 WL 3162045, at \*1, \*6 (Tex. App.—Fort Worth Jun. 6, 2016, no pet.) (mem. op.) (recognizing that bare assertions of error, without meaningful argument or authority, waive error); *see also R.L.D. v. E.N.D.*, No. 05-99-02026-CV, 2001 WL 283098, at \*1, \*5 (Tex. App.—Dallas Mar. 23, 2001, no pet.) (not designated for publication) (mother's complaint that trial court's injunction violated state and federal constitutions waived as inadequately briefed).

We overrule Mother's eighth issue.

## VI. CONCLUSION

Having sustained in part Mother's sixth issue, we modify the trial court's judgment by deleting the words "compounded annually" from the language of the order providing postjudgment interest on the judgment for child support arrearages "at the rate of six percent (6%), compounded annually," and substituting in their place the words "simple interest annually." Likewise, having sustained in part Mother's seventh issue, we modify the trial court's judgment to

---

[10]We express no opinion on whether Mother's hypothetical correctly construes the injunction.

delete the following sentence: "This award for attorney's fees is collectable as child support." Having overruled the remainder of Mother's dispositive issues, we affirm the trial court's judgment as modified. *See* Tex. R. App. P. 43.2(b).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: MEIER, GABRIEL, and SUDDERTH, JJ.

SUDDERTH, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 5, 2017